**BOARD OF FIREMEN'S RELIEF AND RE-TIREMENT FUND TRUSTEES OF HOUSTON, Texas, Appellant,**

**v.**

**Roy Calvin POWERS, Appellee.**

**No. 11442.**

Court of Civil Appeals of Texas.

Austin.

Jan. 25, 1967.

Rehearing Denied Feb. 15, 1967.

**396**

William A. Olson, City Atty., Jay Howell, Senior Asst. City Atty., Houston, for appellant.

Moore & Putnam, Gene E. Putnam, Houston, for appellee.

PHILLIPS, Chief Justice.

This is a suit brought under Tex.Rev.Civ. Stat.Ann. Art. 6243e, Sec. 18 (1957), by Roy Calvin Powers against the Board of Firemen's Relief and Retirement Fund Trustees of Houston, Texas. Powers sued the Board for a pension for total disability incurred in an accident in which he was thrown from a moving fire truck. The Board had denied his application for a pension. Powers appealed this decision of the Board to the Firemen's Pension Commissioner and was again denied relief. Following the denial of relief by the Commissioner, Powers filed suit in the District Court of Travis County, Texas. After trial to the court, judgment was entered granting Powers a total disability pension.

We affirm.

Appellant Board is before this Court on five points of error, the first four, briefed together, are number one; the error of the court in overruling appellant's plea in abatement pointing out that appellee had failed to allege that he had filed with the Board the certificates of disability required by Tex. Rev.Civ.Stat.Ann. Art. 6243e, Sec. 9, (1957). Points two and three complain of the court overruling appellant's special exceptions, and his motion for judgment with reference to appellee's alleged failure to file the abovementioned certificates. Appellant's point four is the error of the court in entering judgment for appellee when there was no evidence that he had filed the abovementioned certificates of disability with the Board.

We overrule these points.

Tex.Rev.Civ.Stat.Ann. Art. 6243e, Sec. 9, (1957) provides as follows:

*"Certificates of disability*

Sec. 9. No person shall be retired either for total or temporary disability, except as herein provided, nor receive any allowance from said Fund, unless and until there shall have been filed with the Board of Trustees, certificates of his disability or eligibility signed and sworn to by said person and/or by the city or town physician, if there be one, or if none, then by any physician selected by the Board of Trustees. Said Board of Trustees, in its discretion, may require other or additional evidence of disability before ordering such retirement or payment aforesaid. * * *"

Appellant contends that this statute should be construed to mean that more than one certificate must be filed, one by the claimant and one by the city or town physician. Should there be no city or town physician, then a certificate must be filed by any physician selected by the Board of Trustees.

In the case at bar, the appellee or claimant filed a certificate and one was filed by a physician chosen by the Board, however, no

certificate was filed by the city physician and there was a city physician available at the time. Consequently, appellant contends that appellee has failed to comply with the requirement of the statute and that neither the administrative bodies of the courts involved have jurisdiction to grant him relief.

We do not construe the statute thus.

We read the statute to require that the claimant must file a certificate of disability with the Board of Trustees "*and/or* by the city or town physician, if there be one, or if none, then by any physician selected by the Board of Trustees." Emphasis added.

Webster's New International Dictionary, Second Edition, unabridged, defines and/or as meaning either and or or.

Thus we construe the statute to mean that either the certificate of the claimant or that of the town physician meets the requirements of the statute. If there is no town physician then either the certificate of the claimant or that of a physician designated by the Board will suffice. Any other construction would place a claimant at the mercy of the city and we do not believe that this is what the legislature intended. It is the general rule that the purpose of the legislation creating a pension plan is to be subserved by a broad and liberal interpretation of the act, and may not be defeated by a narrow and technical construction. 45 Tex.Jur.2d Constitutional and statutory provisions, Sec. 2 (1963) and the cases there cited.

Appellant's point of error number 5 is that of the trial court in entering judgment for appellee when there was substantial evidence to support the decision of the Firemen's Pension Commissioner denying appellee's request for a pension.

We overrule this point.

The test that this Court must apply is whether the administrative decision finds reasonable support in substantial evidence. Board of Firemen's Relief and Retirement Fund Trustees v. Marks, 150 Tex. 433, 242 S.W.2d 181, 27 A.L.R.2d 965 (1951).

In viewing the testimony in its entirety, we find that Powers, age 26 and married, had been an exceptionally fine physical specimen who had done a great amount of physical work during his life. This not only included his work with the fire department, where his work was extremely strenuous requiring a strong and fit body, but included extra jobs that he took on his free time to supplement his salary. This latter work included landscaping in which he used a tractor with various attachments to move earth. In addition to this, Powers' hobbies, which were horseback riding and spear-fishing in the Gulf with an aqua lung, required a strong body. To read the record before us is to get a picture of a strong, energetic person who worked very hard and relaxed with hobbies of a vigorous physical nature. His career also included service in the military forces including service overseas after which he was honorably discharged, however he remained in the Army Reserve Corps.

On June 1, 1959, Roy Calvin Powers became a trainee for the Houston Fire Department. He was required to take a pre-employment physical examination, and at that time was in top physical shape. In training, he practiced climbing ladders as high as five stories, rolling up hose, carrying ladders, carrying rolls of hose up ladders, jumping off fire trucks, catching fire plugs, carrying people out of buildings and down ladders. Powers never had any physical incapacity or trouble in performing these exercises. After three months, he became a probationary plug man and ladder man, which required participation in actual fire fighting. He would jump off the fire truck and begin unloading the hose connecting it to the fire plug. After the fire was extinguished, it was required that he sweep out the building, carry out furniture, chop out sheet rock, and then carry the furniture back into the building.

In March 1960, he became a pipe and ladder man. It was his duty, as he jumped off the back of the fire truck, to carry a 50-pound roll of hose and hook it to the plug. After the fire was extinguished, he was required to roll up the wet hose and carry them to the pumper, where he then stacked them on the tailgate. These wet hose weigh 90 to 100 pounds each. Each fire usually required 30 pieces of fire hose and Powers stacked 15 of them while the other pipe and ladder man stacked the remainder. After the truck returned to the fire station, it was necessary for appellee to take the wet hose off the fire truck, roll them out, and place them in a dryer. Then after the hose were dried, he placed them in sacks along the wall of the fire station. The cleaning of the fire truck followed.

Appellee continued performing these duties for the Houston Fire Department until he was drafted into the United States Army in November 1960. After serving two years, he went back to work for the Fire Department as a pipe and ladder man. On his return, a physical examination revealed that he was in top physical condition. He continued working for the Fire Department the remainder of 1962 and all of 1963, performing all the required duties.

On January 6, 1964, he was working at night for the Fire Department when a box alarm came in. He jumped on the back of the pumper and the truck proceeded down Polk Street in Houston en route to the fire. As the truck entered the intersection, an ambulance, traveling at a high rate of speed, crashed into the front of the fire truck. Upon impact, Mr. Powers was thrown 30 feet from the fire truck, landing on his back in the middle of the concrete street. He was moved from the street and taken by private car to a hospital where, upon examination, it was determined he suffered an injury to his back and shoulders. He consulted his own physician, Dr. Thomas H. McGuire, because he was having considerable pain in his back and between his shoulders. He was placed on medication, and instructed to stay in bed. He was seen by Dr. McGuire once or twice a week until March. Then the District Chief came to see him and asked Mr. Powers to return to work, as the Fire Department was short of firemen. The Chief promised to look after him if he would go back to work.

On March 10, 1964, the second night appellee was back at the station, he was called to a house fire. After the fire was extinguished, appellee was rolling up the wet hose when his back began "popping". As he was lifting a 100-pound wet hose onto the fire truck, he felt like something hit him in his back, and he fell down and couldn't get up. Mr. Powers finished the night at the station, and the next day went to see Dr. McGuire because of the pain in his back and numbness in his right leg. Appellee has not worked in any capacity since the injury of March 10, 1964.

His pain would start at the lower portion of his back in the vicinity where his belt crosses his backbone and run down around his leg on the back side, and continue all the way down into the calf and into the heel and parallel around to the little toe of his foot. This pain occurred shortly after the second accident, and by 1965 both legs were affected by the same type of chronic pain. His legs become numb more frequently now. He wears a back brace continuously. The Army Reserve Corps gave him a medical discharge because of his physical condition. The Texas State Educational Department is paying for his education in college under the State program because of his being totally disabled. He is not able to work, nor can he do anything that involves manual labor. He can no longer jump off a fire truck, roll up a hose, lift a nozzle, man a plug, move furniture out of a house, move furniture back into a house, lift wet hoses, or clean up the fire truck at the end of the day, although if he were physically able, he would do so. Any prolonged sitting hurts his back and his legs become numb, and standing or walking for any prolonged period of time is impossible. Prior to the accident, he could press 120 pounds above his head and was an avid skindiver. He

cannot do this now. He used to work with and ride on horses, train and trim them, prior to these accidents. He cannot ride a horse because of the jarring, and is not able to care for his animals.

Dr. Thomas H. McGuire, a specialist in neurological surgery since 1955, examined and treated appellee for these injuries. Dr. McGuire saw him every ten days until June 12, 1964. Dr. McGuire testified that appellee had numbness over the right foot, ankle, and back of his right leg, and had pain with limitation of motion in his back. He further testified that Mr. Powers had a possible ruptured disk with nerve root irritation.

Dr. McGuire sent Powers to Dr. James R. Oates, a physician who specializes in physical medicine and rehabilitation, who examined Powers on numerous occasions and was still treating him at the time of trial. Dr. Oates ran an electromyographic test on Powers which test showed that Powers had damage to his right first sacral nerve root which supplies major muscles of the right calf.

At first Dr. Oates found that the maximum circumference of Powers' right calf was one fourth inch less than the left suggesting either atrophy of his muscle on the basis of disuse because of pain or damage to the muscle, because there had been damage to the nerve supply, or both. At a later examination Dr. Oates found that the right calf was one half inch smaller than the left concluding that there was some continuing atrophy of the muscles whose nerve supply had been damaged by the nerve root irritation. Dr. Oates prescribed a lumbosacral support garment for Powers' back and advised him to wear it at all times. Dr. Oates testified that Powers' condition would never improve and that the cause of the nerve root irritation was that a piece of disk had ruptured and further that Powers was totally disabled from performing the duties of a fireman.

The evidence relied upon by appellant is that of two doctors, one, Dr. W. H. Hamrick the city physician and the other, Dr. J. Morris Tucker, to whom Powers had been referred by the Board.

Dr. Hamrick examined Powers once on April 28, 1964. From this examination, Dr. Hamrick concluded that Powers was not physically disabled and could resume his duties as a fireman. Dr. Hamrick did not measure Powers' legs however he did a pin-prick test from which he concluded that Powers' muscles were not seriously damaged.

Appellant contends that from this testimony (in addition to Dr. Tucker's which will be discussed later) we have substantial evidence of Powers' fitness and that this evidence is sufficient to sustain the Board's findings. We cannot agree with this. Dr. Hamrick further testified under cross-examination that a doctor who had examined Powers several times would be in a better position to evaluate the case than one who had examined him only once. In addition, Dr. Hamrick testified that Powers' condition could have developed at a date later from the examination that he had made. From the testimony of Dr. Oates, who had followed the case from the beginning through trial, this latter possibility becomes the reasonable probability.

Dr. J. Norris Tucker testified for appellant. He was the doctor who had examined Powers at the behest of the Board. His testimony was inconclusive one way or the other inasmuch as he felt that a correct diagnosis required a myleogram. Dr. Tucker also testified that he would not recognize Powers if he were to walk into the room. We know of no rule that requires a myleogram before we can consider testimony as to possible spine and/or muscle injury.

It is not our intention in summarizing the evidence here to show that such evidence admitted before the court preponderates against the administrative decision but that in viewing the record as a

whole the evidence does not reasonably support the administrative decision.

We affirm the judgment of the trial court.

Affirmed.

O'QUINN, J., not sitting.